**June A. TAYLOR, Individually and as Administratrix of the Estate of Claude H. Taylor, et al., Plaintiffs,**

v.

**AIRCO, INC., et al., Defendants.**

**C.A. No. 02–30014–MAP.**

United States District Court, D. Massachusetts.

June 18, 2007.

Samuel Goldblatt, Nixon Peabody LLP, Buffalo, NY, J. Christopher Allen, Jr., Joseph J. Leghorn, Nixon Peabody, LLP, Boston, MA, Michael Moon, Jr., William E. Padgett, Barnes & Thornburg, Indianapolis, IN, for The Dow Chemical Company.

William B. Baggett, Charles B. Cappel, Wells T. Watson, Baggett, McCall, Burgess, Watson & Gaughan, Lake Charles, LA, for June A. Taylor.

Michael K. Callan, Doherty, Wallace, Pillsbury & Murphy, P.C., Springfield, MA, William Gorenc, Jr., Wegman, Hessler & Vanderbug, Cleveland, OH, for Gencorp.

Timothy J. Coughlin, Thompson Hine LLP, Clearwater, OH, Andrea B. Daloia, Thomas L. Feher, Heidi B. Goldstein, Demaris G. Fisher, Thompson Hine LLP, Cleveland, OH, Mark S. Granger, William A. Staar Morrison, Morrison Mahoney LLP, Boston, MA, Robert M. Mack, Morrison, Mahoney & Miller, Dorothy Varon Robinson, Donovan, P.C., Springfield, MA, for Goodrich Corporation.

Gail C. Ford, Vorys, Sater, Seymour and Pease, LLP, Columbus, OH, Brian D. Gross, John B. Manning, Cooley, Manion & Jones, PC, Boston, MA, Eric Watt Wiechmann, Cummings & Lockwood, Hartford, CT, for Goodyear Tire & Rubber Company.

Herschel L. Hobson, The Law Offices of Herschel L. Hobson, Beaumont, TX, David S. Lawless, Keith A. Minoff, Robinson Donovan, P.C., Springfield, MA, Ron Simon, Simon & Associates, Washington, DC, for Bruce H. Taylor, Dustin H. Taylor, June A. Taylor and Russell H. Taylor.

Joseph L. Kociubes, Bingham McCutchen LLP, Mary B. Murrane, Boston, MA, for Borden, Inc.

Erica Cline Blackledge, Kevin M. Donovan, Susannah R. Henderson, Victoria J. Miller, Glenn R. Stuart, Morgan, Lewis & Bockius, LLP, Philadelphia, PA, Kevin Mark Cuddy, Paul B. Galvani, Jane E. Willis, Ropes & Gray, LLP, Boston, OH, for Rhone–Poulenc, Inc.

W. Ray Persons, Carmen R. Toledo, Elizabeth Semancik, King & Spaulding LLP, Atlanta, GA, Cynthia A. Stroman, King & Spaulding, Washington, DC, for Union Carbide Corp.

## MEMORANDUM REGARDING DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT ON MEDICAL CAUSATION (Docket No. 534)

PONSOR, District Judge.

### I. INTRODUCTION

On March 19, 2007, the court issued an order denying Defendants' motion for summary judgment on medical causation, setting forth its reasons in condensed form

and promising a later amplification. This memorandum will detail the court's reasoning in allowing the adversarial process to test Plaintiff's theory that exposure to vinyl chloride (VC) can cause intrahepatic cholangiocarcinoma (IC), a rather rare form of biliary cancer.

Defendants argued vigorously that *no* scientific evidence supports any connection specifically between VC and IC. Plaintiffs responded that the absence of epidemiological or other evidence on this narrow point was not surprising, given the low incidence of IC generally. They argued, however, that a jury could reasonably agree with their experts, who are prepared to opine at trial that the connection between VC and types of biliary and liver cancer similar to IC provides a sufficient basis to find the connection between VC and IC as well.[1] While a jury may eventually find the defendants' experts more persuasive, the court cannot say as a matter of law that no reasonable jury could side with the plaintiffs on this point.

## II. BACKGROUND

### A. Plaintiffs' Decedent.

Claude Taylor began work at the Monsanto Indian Orchard Facility in Springfield, Massachusetts in July 1953 as a pressman. He was first exposed to VC in either July or October 1954 when he was assigned to a new department as a VC polymerization worker, and his exposure continued for the next twenty-one years of his employment. Taylor's job titles included kettle operator, assistant kettle operator, spray drier operator, kettle operator-suspension, and control kettle operator. All these jobs were recognized as requiring high intensity levels of VC exposure.

At age 65, on March 20, 2000, Taylor was diagnosed with inoperable intrahepatic cholangiocarcinoma. He died on October 30, 2000, seven months after his diagnosis. June Taylor, the administratrix of his estate, along with his family brought this suit against numerous defendants on various grounds. As noted, they have claimed that exposure to VC during Taylor's employment with Monsanto was the cause of his illness and death. To meet their burden of proof, Plaintiffs propose to offer the testimony of three well qualified experts.[2]

### B. A Primer on the Liver and Biliary Tract.

The liver is the largest internal organ, with a wide range of functions including receiving the products of digestion and converting them to stored energy, regulating the body's blood volume, metabolizing and removing foreign toxins, maintaining

---

1. Defendants do not suggest that any scientific evidence affirmatively rejects a connection between VC and IC, only that none exists to support it.

2. On March 19, 2007, the court denied Defendants' motions-in-limine, challenging Plaintiffs' experts' qualifications. Fed.R.Evid. 702 requires the judge to ensure that the proposed expert witness is qualified by "knowledge, skill, experience, training, or education." *See Poulis–Minott v. Smith*, 388 F.3d 354, 359 (1st Cir.2004) ("It is the responsibility of the trial judge to act as gatekeeper to ensure that the expert is qualified before admitting expert testimony."). "It is well-settled that 'trial judges have broad discretionary powers in determining the qualification, and thus, admissibility, of expert witnesses.' " *Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 30 (1st Cir. 2000) (quoting *Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co.*, 954 F.2d 19, 20 (1st Cir.1992)). The court noted that "[t]o the extent that Defendants may wish to argue that discrete areas of a particular witness's testimony are beyond the scope of the witness's expertise, they may request a *voir dire* shortly prior to, or during, the trial to provide a foundation for exclusion." (Memorandum and Order, Dkt. No. 679).

metabolic balance, and producing bile, a substance used in digestion.

Bile ducts carry bile from the liver to the upper small intestine, where it is deposited to aid digestion. The biliary tract is divided into the intrahepatic biliary system and the extrahepatic biliary system. Small branches of the bile ducts, termed intrahepatic bile ducts, extend into the liver. The larger bile ducts outside the liver are known as extrahepatic bile ducts.

Malignancies of the biliary tract are fairly uncommon. Unfortunately, they are often first seen at an advanced stage and therefore are associated with high morbidity and mortality rates. Samuel A. Wells, *Malignancies of the Biliary Tract,* Current Problems in Surgery, 23:15 (1995). Intrahepatic cholangiocarcinoma, the variety that led to the death of Claude Taylor, is a cancer of the bile duct that is anatomically located in the liver. IC arises in cells of the intrahepatic portion of the bile ducts called biliary epithelial cells or cholangiocytes.

The cancer most commonly associated with vinyl chloride exposure is angiosarcoma of the liver (ASL). This is a type of primary liver cancer, which arises in the endothelial cells in the liver. There are at least four other distinct cancers arising in the liver and biliary tracts: hepatocellular carcinoma, hepatoblastoma, extrahepatic cholangiocarcinoma, and gallbladder cancer.

Defendants in support of their motion for summary judgment on medical causation emphasized what they considered to be the fundamental differences between IC and these other liver and biliary cancers. For example, ASL is a "sarcoma," while IC is a "carcinoma." Sarcomas are cancers of the connective tissues, such as muscles and bone; sarcomas may arise in the class of cells termed endothelial cells[3]. In contrast, carcinomas are cancers of the epithelial tissues, such as glands; carcinomas arise in the class of cells termed epithelial cells. Defendants concede the well established connection between ASL and VC, but they contend that the absence of any affirmative scientific evidence linking VC to IC, a different form of cancer, is fatal to Plaintiffs' case. Cancers, and their causative agents, Defendants argue, are not interchangeable. As a general matter, of course, it is hard to argue with this proposition; its relevance to the causation issue in this case, however, is debatable.

## C. *Epidemiological Studies.*

Vinyl chloride, an established carcinogen for humans, has been the subject of considerable epidemiologic research; it has also been the subject of a substantial amount of litigation. Vinyl chloride, "a colourless gas under normal temperature and pressure, is used almost exclusively to manufacture polyvinyl chloride (PVC) resin." K.A. Mundt, L.D. Dell, R.P. Austin, R.S. Luippold, R. Noess, C. Bigelow, *Historical cohort study of 10,109 men in the North American vinyl chloride industry, 1942–1972: update of cancer mortality to 31 December 1995,* Occup. Env. Med. 2000, 57:774. ("Mundt").

The International Agency for Research on Cancer (IARC) has found sufficient evidence of carcinogenecity in humans to classify VC as a group 1 carcinogen. Workers who cleaned caked polymer from PVC reactor vessels, or autoclaves, historically

---

3. The endothelium is comprised of a layer of flat cells that line the blood vessels, lymphatic vessels, and the heart. Endothelial cells line the entire circulatory system, from the heart to the smallest capillary. The epithelium is the cellular covering of internal and external body surfaces, including the lining of vessels and small cavities. Epithelial cells line the insides of the lungs, the gastrointestinal tract, the reproductive and urinary tracts.

sustained exposures to the highest concentrations of vinyl chloride. *Mundt*, at 774. For purposes of this motion, Defendants accept that Claude Taylor's job position involved this sort of work.

Cancers, particularly angiosarcoma of the liver (ASL), have been monitored in a number of employee cohorts in whom specific occupational exposure to VC could be identified. See J.K. McLaughlin and L. Lipworth, *A critical review of the epidemiologic literature on health effects of occupational exposure to vinyl chloride*, J. Epidemiology and Biostatistics (1999) vol. 4, No. 4, 253 ("McLaughlin").

Scientific literature notes strong suspicion regarding a link between VC and liver and biliary cancers other than ASL. As the McLaughlin review states, "[a]lthough the only consistent evidence of increased risks of cancer following vinyl chloride exposure exists for angiosarcoma of the liver, ... several studies confirm that exposure to vinyl chloride causes other forms of cancer...." *Id.* (citations omitted). Another report indicates that there is "controversy about the association between vinyl chloride and the other cancers...." Otto Wong, Donal Whorton, Donna E. Fliart, and David Ragland, *An Industry–Wide Epidemiologic Study of Vinyl Chloride Workers, 1942–1982*, Am. J. Of Ind. Medicine 20:317–334 (1991)(emphasis added). ("Wong")

A comprehensive analysis, the *Wong* study, observed an excess of mortality following exposure to VC from cancer, primarily "cancer of the liver and biliary tract." *Id.* at 321. For these cancers, viewed as a group, 37 deaths were observed, compared with only 5.77 expected (SMR [4] = 641.2).[5]

More significantly, this study found that, even if cases of angiosarcoma (the cancer type most commonly associated with exposure to VC), were eliminated, the incidence of other forms of liver and biliary cancer, including IC, was still higher than would be expected under ordinary circumstances. *Id.* at 330.

The Wong study refined its analysis even further by separating biliary tract cancers from liver cancers, finding a significant occurrence of biliary cancers was present in vinyl chloride workers. *Id.* The study observed 7 deaths from biliary cancers compared to the 2.7 expected (SMR = 259).

Thus, although the *Wong* study did not focus exclusively on the very small sample of IC cancers, it found that non-ASL cancers (which includes IC), as well as biliary

---

4.  SMR, or standardized mortality ratio, in epidemiology is the ratio of observed deaths to expected deaths according to a specific health outcome in a population. The calculation used to determine the SMR is simple: number of observed deaths/number of expected deaths. The SMR may be quoted as either a ratio or a percentage. If the SMR is quoted as a ratio and is equal to 1.0, then this means the number of observed deaths equals that of expected cases. If higher than 1.0, then there is a higher number of deaths than would be expected under normal circumstances. Similarly, an SMR of 100 would mean that the risk in the study population is equal to that of the general population. For example, an SMR of 641 represents a relative risk of dying from a particular cancer that is 6.4 times greater than that of the general population.

5.  The data in the *Wong* study were evaluated by length of exposure and led to the conclusion that cohort members categorized as having had 20 or more years of exposure demonstrated the highest risk of dying from liver and biliary cancer (SMR = 1285). Furthermore, when data were analyzed by age at first exposure, the greatest risk of death from liver and biliary cancer was observed among those workers who were first exposed to VC before 25 years of age. Taylor was first exposed to VC at age 19, and experienced more than 20 years of exposure.

cancers (which also includes IC) increased upon exposure to VC. In an update of the *Wong* study, similar findings related to liver and biliary cancers were reported. K.A. Mundt, L.D. Dell, R.P. Austin, R.S. Luipold, R. Noess, and C. Bigelow, *Historical cohort study of 10,109 men in the North American vinyl chloride industry, 1942–1972; update of cancer mortality to 31 December 1995*, Occup. Environ. Med. 2000: 57:224–791.

Another study reported the results of mortality rates among European workers exposed to VC. L. Simonato, K.A. L'Abre, A. Andersen, S. Belli, P Comba, G Engholm, G. Ferro, L. Hagmar, S Langard, I Lundberg, R. Pirastu, P. Thomas, R Winkelmann, and R. Saracci, *A collaborative study of cancer incidence and mortality among vinyl chloride workers*, Scand. J. Work. Environ. Health 1991 17:159, 163 Table 5. The study analyzed data for cohort members who had "ever" been autoclave workers and for those who had "never" been autoclave workers. *Id.* For those members with 15 years of latency, who had been autoclave workers, the SMR was 1254, while that of non-autoclave workers was 284. *Id.* As noted, Taylor's jobs categorize him as an autoclave worker. The *Simonato* study also demonstrated an SMR of 714 for those employed for 20–24 years. Taylor's exposure to VC while at Monstanto lasted 21 years.

In an update to the *Simonato* study, the relative risk of liver and biliary cancer, excluding ASL, for those who worked as autoclave workers, was 2.49 times greater than for those workers who had never been employed as autoclave workers. E. Ward, P. Boffetta, A. Andersen, D. Colin, P. Comba, J.A. Deddens, *Update of the follow-up of mortality and cancer incidence among European worker employed in the vinyl chloride industry*, Epidemiology 2001; 12:710–718.

In a meta-analysis of studies which addressed occupational exposure to VC in relation to cancer mortality, an increased risk of liver and biliary cancer was reported after the exclusion of known deaths from angiosarcoma of the liver. Paolo Boffetta, Linda Matisane, Kenneth A. Mundt, Linda D. Dell, *Meta–Analysis of studies of occupational exposure to vinyl chloride in relation to cancer mortality*, Scand. J. Work. Environ. Health 2003 29(3):220, 225.

## III. DISCUSSION

■ Defendants primarily object to the use of the broad category of liver and biliary cancers in evaluating risk from exposure to VC. The evidence of record favoring Plaintiffs, however, focuses much more narrowly than Defendants appear willing to acknowledge. Thus, for example, well accepted scientific studies demonstrate that a relatively small category of liver and biliary cancers (excluding the most common type, ASL, and including Claude Taylor's disease, IC) exhibits a demonstrable link to VC exposure. Moreover, when liver cancers are excluded from the analysis, biliary cancers such as IC also exhibit this causative link. Finally, Plaintiff's employment responsibilities were of exactly the kind that were most likely to characterize victims of VC-induced cancer, and his age of first exposure and length of exposure also parallel the profile of a typical VC-linked cancer victim. Putting all these factors together, a jury could well conclude that Claude Taylor's IC was caused by his exposure to VC.

■ Moreover, Plaintiffs' position is well supported by his proposed experts. As the Supreme Court has noted, the critical issue in weighing the admissibility of expert testimony is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Assuming this level of professional stringency is met, the evaluation of expert testimony is best left to the jury. The Supreme Court noted that it would be "unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[6] The First Circuit has also noted that the party who proffers expert testimony need not "carry the burden of proving to the judge that the expert's assessment of the situation is *correct.*" *Ruiz–Troche,* 161 F.3d at 85 (emphasis added). The studies described above provided adequate support to mark the experts' testimony as reliable. *See Amorgianos v. Amtrak,* 303 F.3d 256, 266 (2d Cir.2002) ("In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.").

*Daubert,* as stressed in the Advisory Note to the December 1, 2000 Amendment to Fed.R.Evid. 702, "did not work a 'sea-change over federal evidence law,' and 'the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system.'" *Cf. United States v. Mitchell,* 365 F.3d 215, 245 (3d Cir.2004). "In short, Daubert neither requires nor empowers trial courts to determine which of several competing theories has the best provenance." *Ruiz–Troche v. Pepsi Cola Bottling Co.,* 161 F.3d 77, 85 (1st Cir.1998) (citations omitted).[7]

## IV. CONCLUSION

For the foregoing reasons, the court denied Defendants' Motion for Summary Judgment on Medical Causation. The court currently has under advisement additional motions for summary judgment by Defendants, with further submissions on some of them due July 6, 2007. Favorable rulings on these motions may still terminate this case. If some or all of these motions are denied, the case may proceed to trial against the Defendants Goodrich Corporation, The Dow Chemical Company, and Union Carbide Corporation on October 15, 2007.

---

**6.** "Burdens of proof, while they work well in resolving most legal disputes, do not easily lend themselves to the resolution of scientific controversies. Science, by and large, rejects binary decision making in favor of a more nuanced quest for understanding. While a scientist might testify that a supposed fact has been proved to be false, the same scientist, when asked about conflicting data, will say only that an asserted fact has not been disproved or 'falsified' and could therefore 'possibly' be true." *United States v. Massachusetts Water Resources Authority,* 97 F.Supp.2d 155, 157 (D.Mass.2000).

**7.** In the context of a full trial on the merits, "[Plaintiffs'] general causation hypothesis may prove too tenuous to withstand brevis judgment." *Smith v. General Electric Co.,* 2004 WL 870832, at * 5. In this regard, it is worth noting that a ruling admitting expert testimony is "not final on the reliability of [expert] opinion evidence, and the opponent of that evidence may challenge its validity before the trier of fact." *Commonwealth v. Lanigan (II),* 419 Mass. 15, 26, 641 N.E.2d 1342 (1994).